602 S.E.2d 542

**STATE of West Virginia ex rel. ABRAHAM LINC CORPORATION, Petitioner**

v.

**The Honorable Thomas A. BEDELL, Judge of the Circuit Court of Harrison County; and John Edens, Respondents**

**No. 31538.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 18, 2003.

Decided July 1, 2004.

Concurring Opinion of Justice Davis July 2, 2004.

Concurring Opinion of Justice Starcher July 15, 2004.

Daniel C. Cooper, Christopher B. Denson, Steptoe & Johnson, Clarksburg, West Virginia, Attorneys for the Petitioner.

Frank P. Bush, Jr., Frank P. Bush, Jr., & Associates, Elkins, West Virginia, Attorney for the Respondent, John Edens.

PER CURIAM:

This is an original proceeding in which the Petitioner, Abraham Linc Corporation (hereinafter "Petitioner"), seeks a writ of prohibition against the Honorable Thomas A. Bedell, Judge of the Circuit Court of Harrison County, preventing the respondent judge

from conducting a trial on Count II of the Petitioner's complaint and submitting the issue of the Petitioner's workers' compensation coverage to a jury. Upon thorough review of the matter, we grant the requested writ.

### I. Factual and Procedural History

The Petitioner operates a wholesale carpet business in Bridgeport, West Virginia. On April 25, 2001, Petitioner's employee, Mr. John Edens, sustained injuries when he was caught between rollers of a carpet cutting and wrapping machine. A co-worker, Mr. Don Johnson, had pressed an incorrect switch causing the rollers to spin while Mr. Edens was standing on the machine. Mr. Edens thereafter filed a personal injury action in the lower court against the Petitioner. Count One of the complaint alleged various safety hazards and asserted a deliberate intent cause of action against the Petitioner, pursuant to West Virginia Code § 23–4–2(c)(2)(ii) (1994) (Repl.Vol.2002).[1] Count Two of the complaint asserted that the Petitioner was in default under the West Virginia Workers' Compensation Act and had consequently forfeited the statutory immunity to a civil action for negligence. Specifically, Mr. Edens maintained that the Petitioner was in default because it had not included the wages of Mr. Johnson in the determination of premiums payable under West Virginia Code § 23–2–5(a) (1999) (Repl.Vol.2002).[2] As a result of that alleged failure, Mr. Edens maintained that the Petitioner could be sued in a common law negligence action since the alleged default caused the Petitioner to lose its statutory immunity.[3]

The Petitioner filed a motion for summary judgment, contending that Mr. Johnson's wages did not have to be included in the computation of workers' compensation premiums since Mr. Johnson served as an independent contractor rather than an employee of the Petitioner. Further, the Petitioner asserted that it possesses a Certificate of Coverage, valid from April 1, 2001, through August 31, 2001, issued by the Workers' Compensation Commission[4] and certifying that the Petitioner's premium account was in good standing at the time of Mr. Edens' injury. In Mr. Edens' response to the Petitioner's motion for summary judgment, he asserted the Mr. Johnson's wages had to be included because he was an employee rather than an independent contractor, that failure to so include caused a default, and that the Petitioner had lost its immunity to a common law negligence action. The lower court denied the Petitioner's motion for summary judgment and ruled that the issue of default and the proper classification of Mr. Johnson as an employee or an independent contractor should proceed to a jury.[5]

### II. Standard for Determining Issuance of Writ of Prohibition

Syllabus point one of *State ex rel. UMWA International Union v. Maynard,*

---

**1.** We note that W.Va.Code § 23–4–2 was amended in 2003, and the language upon which Mr. Edens premises his deliberate intent allegation is now found in W.Va.Code § 23–4–2(d)(2)(ii) (2003) (Spec.Supp.2003).

**2.** Premiums payable by an employer are determined as a percentage of the employer's gross wages payroll for all employees. W.Va.Code § 23–2–5(a). Although this section was amended in 2003, those amendments do not affect our decision in this appeal.

**3.** A common law action against an employer is authorized under West Virginia Code § 23–2–8 (1991) (Repl.Vol.2002) if an employer defaults in the payment of workers' compensation premiums. By procuring a finding that the Petitioner was in default, Mr. Edens would be permitted to initiate a common law negligence action against the Petitioner and would not be limited to the relief available through the statutory workers' compensation system.

**4.** That Certificate of Coverage is included in the record before this Court. We also note that the Workers' Compensation Division was renamed the Workers' Compensation Commission in 2003. *See* W.Va.Code § 23–1–1(c) (2003) (Spec.Supp.2003).

**5.** Subsequent to the summary judgment denial, the Petitioner filed a motion for reconsideration and an alternative motion to bifurcate pursuant to Rule 42 of the West Virginia Rules of Civil Procedure. The Petitioner requested that the trial be separated into two phases, the first regarding Mr. Edens' claim that the Petitioner had lost its immunity from a common law negligence action and the second for Mr. Edens' liability and damages claims. Those motions were also denied by the lower court. Based upon our ultimate conclusion that a jury trial on the independent contractor issue is not warranted, the bifurcation issue is no longer relevant.

176 W.Va. 131, 342 S.E.2d 96 (1985), provides: "A writ of prohibition shall lie as a matter of right in all cases of usurpation and abuse of power, when the inferior court has not jurisdiction of the subject matter in controversy, or, having such jurisdiction exceeds its legitimate powers." *See* W.Va.Code § 53–1–1 (1923) (Repl.Vol.2000). In syllabus point two of *State ex rel. Peacher v. Sencindiver,* 160 W.Va. 314, 233 S.E.2d 425 (1977), this Court explained that "[a] writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W.Va.Code,* 53–1–1." [6]

■ Syllabus point four of *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996), explains the manner in which a request for a writ of prohibition should be addressed, as follows:

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

### III. Discussion

Mr. Edens contends that the lower court was correct in its decision that the issue of the Petitioner's workers' compensation coverage based upon an alleged erroneous classification of an independent contractor should be submitted to the jury for resolution. The Petitioner maintains, however, that the Workers' Compensation Commission's issuance of a Certificate of Coverage and the absence of any finding of delinquency or default by the Commissioner renders such submission unnecessary because there are no material facts in dispute regarding the Petitioner's workers' compensation coverage status.

■ The principles underlying the West Virginia Workers' Compensation system are well-established. "The Workmen's Compensation Act was designed to remove *negligently* caused industrial accidents from the common law tort system." *Mandolidis v. Elkins Indus., Inc.,* 161 W.Va. 695, 700, 246 S.E.2d 907, 911 (1978), *superseded by statute as stated in Handley v. Union Carbide Corp.,* 804 F.2d 265, 269 (4th Cir.1986). "The benefits of this system accrue both to the employer, who is relieved from common-law tort liability for negligently inflicted injuries, and to the employee, who is assured prompt payment of benefits." *Meadows v. Lewis,* 172 W.Va. 457, 469, 307 S.E.2d 625, 638 (1983); *see also Persinger v. Peabody Coal Co.,* 196 W.Va. 707, 713, 474 S.E.2d 887, 893 (1996).[7]

---

**6.** In *State ex rel. Chase Resorts, Inc. v. Campbell,* 913 S.W.2d 832 (Mo.App.1995) the Missouri court explained that "[i]ssuance of a Writ of Prohibition is generally the appropriate remedy to forestall unwarranted and useless litigation." 913 S.W.2d at 837. The court held that prohibition would lie to prevent the lower court from holding a jury trial on the issue of reasonableness of attorney fees. *See also State ex rel. Police Retirement Sys. v. Mummert,* 875 S.W.2d 553 (Mo.1994).

**7.** "That philosophy has commonly been described as a *quid pro quo* on both sides: in return for the purchase of insurance against job-related injuries, the employer receives tort immunity; in return for giving up the right to sue the employer, the employee receives swift and sure benefits." *Dominion Caisson Corp. v. Clark,* 614 A.2d 529, 532–33 (D.C.1992) *quoting Meiggs v. Associated Builders, Inc.,* 545 A.2d 631, 634 (D.C.1988), *cert. denied,* 490 U.S. 1116, 109 S.Ct. 3178, 104 L.Ed.2d 1040 (1989).

## A. The Statutory Procedure

■ West Virginia Code § 23–2–6 (1991) (Repl.Vol.2002)[8] provides exemption from common law tort liability to contributing employers, as follows:

Any employer subject to this chapter who shall subscribe and pay into the workers' compensation fund the premiums provided by this chapter or who shall elect to make direct payments of compensation as herein provided shall not be liable to respond in damages at common law or by statute for the injury or death of any employee, however occurring, after so subscribing or electing, and during any period in which such employer shall not be in default in the payment of such premiums or direct payments and shall have complied fully with all other provisions of this chapter. The continuation in the service of such employer shall be considered a waiver by the employee and by the parents of any minor employee of the right of action as aforesaid, which the employee or his or her parents would otherwise have: Provided, That in case of employers not required by this chapter to subscribe and pay premiums into the workers' compensation fund, the injured employee has remained in such employer's service with notice that his employer has elected to pay into the workers' compensation fund the premiums provided by this chapter, or has elected to make direct payments as aforesaid.

W.Va.Code § 23–2–6 (emphasis supplied). As this Court succinctly stated in *State ex rel. Frazier v. Hrko*, 203 W.Va. 652, 510 S.E.2d 486 (1998), " '[w]hen an employer

subscribes to and pays premiums into the Fund, and complies with all other requirements of the Act, the employer is entitled to immunity for any injury occurring to an employee and shall not be liable to respond in damages at common law or by statute.' *W.Va.Code*, 23–2–6 [1991]." 203 W.Va. at 659, 510 S.E.2d at 493. Footnote eleven of *Frazier* explained: "This statute is also known as the 'exclusivity' provision, as it makes workers' compensation benefits the exclusive remedy for personal injuries sustained by an employee injured in the course of and resulting from his or her covered employment." *Id.* at 659 n. 11, 510 S.E.2d at 493 n. 11.

■ The immunity provided by § 23–2–6 is not easily forfeited. As the District Court for the Southern District of West Virginia explained in *Smith v. Monsanto Co.*, 822 F.Supp. 327 (S.D.W.Va.1992), "[u]nder the Act, an employer who is otherwise entitled to immunity under § 23–2–6 may lose immunity in only one of two ways: (1) by defaulting in payments required by the Act or otherwise failing to comply with the provisions of the Act, or (2) by deliberately intending to produce injury or death to the employee." 822 F.Supp. at 330 (citation omitted).

■ Specifically, West Virginia Code § 23–2–8 (1991) (Repl.Vol.2002), provides that an employer will lose the statutory immunity of West Virginia Code § 23–2–6 if it is in default in the payment of premiums to the worker's compensation fund or fails to otherwise fully comply with the provisions of West Virginia Code §§ 23–2–5 or 23–2–9.[9]

---

**8.** West Virginia Code § 23–2–6 was modified slightly in 2003. These alterations do not affect this appeal.

**9.** The full text of West Virginia Code § 23–2–8 provides as follows:

All employers required by this chapter to subscribe to and pay premiums into the workers' compensation fund, except the state of West Virginia, the governmental agencies or departments created by it, and municipalities and political subdivisions of the state, and who do not subscribe to and pay premiums into the workers' compensation fund as required by this chapter and have not elected to pay individually and directly or from benefit funds compensation and expenses to injured employ-

ees or fatally injured employees' dependents under the provisions of section nine [§ 23–2–9] of this article, or having so subscribed or elected, shall be in default in the payment of same, or not having otherwise fully complied with the provisions of section five or section nine [§ 23–2–5 or § 23–2–9] of this article, shall be liable to their employees (within the meaning of this article) for all damages suffered by reason of personal injuries sustained in the course of employment caused by the wrongful act, neglect or default of the employer or any of the employer's officers, agents or employees while acting within the scope of their employment and in the course of their employment and also to the personal representatives of such employees where death results from such personal injuries, and in any action by any

The preeminent issue to be acknowledged in this case is that the statutory scheme does not mandate loss of immunity immediately upon an employer's payment delay, mistake, or error in compliance. The statutes construct a detailed process through which employer lapse is resolved. West Virginia Code § 23–2–5(b), for instance, provides that "[f]ailure of an employer ... to maintain an adequate premium deposit, shall cause the employer's account to become delinquent." Pursuant to West Virginia Code § 23–2–5(c), subsequent to a determination that an account is delinquent, the division is required to notify the delinquent employer of its status and explain the legal consequences of a potential default. West Virginia Code § 23–2–5(d) then clarifies that only when the delinquency is not cured within a prescribed period is a default possible. That section provides that "[f]ailure by the employer, who is required to subscribe to the fund and who fails to resolve the delinquency within the prescribed period, shall place the account in default and shall deprive such default employer of the benefits and protection afforded by this chapter...." West Virginia Code § 23–5–1(a) (1995) (Repl.Vol.2002) [10] provides the authority of the Commission to hear issues within its jurisdiction, as follows:

> *The workers' compensation division shall have full power and authority to hear and determine all questions within its jurisdiction.* In matters arising under articles three and four [§§ 23–3–1 et seq. and 23–4–1 et seq.] of this chapter, the division shall promptly review and investigate all claims. The parties to a claim

such employee or personal representative thereof, such defendant shall not avail himself of the following common-law defenses: The defense of the fellow-servant rule; the defense of the assumption of risk; or the defense of contributory negligence; and further shall not avail himself of any defense that the negligence in question was that of someone whose duties are prescribed by statute: Provided, That such provision depriving a defendant employer of certain common-law defenses under the circumstances therein set forth shall not apply to an action brought against a county court [county commission], board of education, municipality, or other political subdivision of the state or against any employer not required to cover his employees under the provisions of this chapter.

shall file such information in support of their respective positions as they deem proper. *In addition, the division is authorized to develop such additional information that it deems to be necessary in the interests of fairness to the parties and in keeping with the fiduciary obligations owed to the fund.* With regard to any issue which is ready for a decision, the division shall explain the basis of its decisions.

W.Va.Code § 23–5–1(a) (emphasis supplied).

The West Virginia Code of State Rules further elucidates the procedures established for calculations and resolutions of delinquency and default issues, providing additional details regarding particular requirements for notice of delinquency, notice of default, and the manner in which an employer may seek reinstatement. For instance, Section 85–11–6 provides the mechanism for audits of employers where the division desires verification of the number of employees or wages paid during certain periods.[11] Section 85–11–9 provides authority for the commencement of a civil action by the division. "Default" is specifically defined by West Virginia Code of State Rules § 85–11–2.5a as follows:

> The failure by a subscriber or a self-insured employer which has not made a payment or filed a report due by it under the provisions of the Act and which has received a subsection 3.3. notice of delinquency but has further failed to make the payment or file the report within the time period specified by the notice.

10. West Virginia Code § 23–5–1 was also modified slightly in 2003, primarily altering word choice and substituting the word "commission" for the former term, "division." The changes do not affect this appeal.

11. West Virginia Code § 23–1–19(a) (2003) (Spec.Supp.2003), not in effect at the time of Mr. Edens' injury, also provides civil remedies for the Workers' Compensation Commission, as follows: "Any ... corporation ... which willfully, by means of false statement or representation, or by concealment of any material fact, ... obtains ... reduced premium costs ... shall be liable to the workers' compensation commission in an amount equal to three times the amount of such benefits, payments or allowances to which he or it is not entitled[.]"

The legislature has also provided an element of protection to employees, as follows in West Virginia Code § 23–2–5(g): "With the exception noted in subsection (h), section one of this article, no employee of an employer required by this chapter to subscribe to the workers' compensation fund shall be denied benefits provided by this chapter because the employer failed to subscribe or because the employer's account is either delinquent or in default." [12] West Virginia Code § 23–2–5(h)(1) provides: "The provisions of this section shall not deprive any individual of any cause of action which has accrued as a result of an injury or death which occurred during any period of delinquency not resolved in accordance with the provisions of this article, or subsequent failure to comply with the terms of the repayment agreement."

### B. The Judicial Responsibility to Observe Statutory Procedure

This Court has consistently respected the preeminence of the statutory schemes in workers' compensation law. In *Bailes v. State Workmen's Compensation Commissioner*, 152 W.Va. 210, 161 S.E.2d 261 (1968), for example, this Court explained that "[t]he right to workmen's compensation is wholly statutory and is not in any way based on the common law. The statutes are controlling and the rights, remedies and procedure provided by them are exclusive." 152 W.Va. at 212, 161 S.E.2d at 263 (citation omitted). In *Roberts v. Consolidation Coal Co.*, 208 W.Va. 218, 539 S.E.2d 478 (2000), this Court acknowledged that " '[i]t has been held repeatedly by this Court that the right to workmen's compensation benefits is based wholly on statutes, in no sense based on the common law; that such statutes are sui generis and controlling; that the rights, remedies and procedures thereby provided are exclusive[.]' " 208 W.Va. at 234, 539 S.E.2d at 494, *quoting Bounds v. State Workmen's Compensation Comm'r*, 153 W.Va. 670, 675, 172 S.E.2d 379, 382–83 (citations omitted); *see also Boyd v. Merritt*, 177 W.Va. 472, 474,

354 S.E.2d 106, 108 (1986) ("The right to workers' compensation benefits is wholly a creature of statute"); *Lester v. State Workmen's Comp. Comm'r*, 161 W.Va. 299, 315, 242 S.E.2d 443, 452 (1978) ("[T]he legislature has the power to modify this state's industrial insurance program as it sees fit so long as no constitutional provision is infringed"); *Ferguson v. State Workmen's Comp. Comm'r*, 152 W.Va. 366, 371, 163 S.E.2d 465, 468 (1968), *overruled on other grounds by Martin v. Workers' Comp. Div.*, 210 W.Va. 270, 557 S.E.2d 324 (2001) ("Alleged rights and remedies, not provided by the workmen's compensation statutes, can not be recognized or granted by the courts").

 This Court must accede to the methodology established by the legislature and the rules and regulations designed to determine an employer's continuing entitlement to workers' compensation coverage, immunities, and defenses. This legislative construct for the workers' compensation system envisions an administrative body which bears the responsibility of determining the delinquency or default status of employers within its own system.

In footnote seven of *Erie Insurance Property and Casualty Co. v. Stage Show Pizza, JTS, Inc.*, 210 W.Va. 63, 553 S.E.2d 257 (2001), this Court acknowledged the mechanism designed by West Virginia Code § 23–2–5(d), "specif[ying] that if an employer is delinquent in its duties to the workers' compensation fund, and the employer fails to resolve that delinquency, then the Workers' Compensation Division may choose to place the employer 'in default.' " 210 W.Va. at 70 n. 7, 553 S.E.2d at 264 n. 7. This Court has also held that when an employer has been determined to be in default by the Workers' Compensation Commission, that declaration is binding upon trial courts. In syllabus point two of *Frazier*, this Court stated:

Under *W.Va.Code*, 23–2–5(d) [1986], in the absence of a final ruling by the Work-

---

**12.** There is no dispute in the present case that the Petitioner made premium payments which reflected Mr. Edens' status as an employee. Mr. Edens' right to obtain workers' compensation benefits is not affected by the status of Mr. Johnson. The only possible benefit to be derived by

Mr. Edens through an adjudication of the issue of Mr. Johnson's status is an ultimate finding that the Petitioner was in default at the time of Mr. Edens' injury, thereby forfeiting its immunity and defenses and subjecting itself to a common law negligence action by Mr. Edens.

ers' Compensation Commissioner, a trial court may find an employer in default under the Workers' Compensation Act. However, if the Commissioner has made a final ruling that an employer is in default, then the Commissioner's ruling is binding upon a trial court. The Commissioner's ruling may not be collaterally attacked in a subsequent proceeding considering the same issue, and the employer's proper remedy is to seek review of the ruling through the appellate process established by *W.Va. Code*, 23–2–17 [1990].

203 W.Va. at 654–55, 510 S.E.2d at 488–89. The holding in *Frazier* was ultimately premised upon the following conclusion: "We believe that the trial court in this case exceeded its legitimate powers and impinged on the jurisdiction of the Commissioner by failing to accept the Commissioner's determination that Pioneer and Top Flite were in default of their workers' compensation obligations." *Id.* at 662, 510 S.E.2d at 496. Thus, the issue of loss of immunity in *Frazier* was determined as a matter of law, based upon fact that the Workers' Compensation Commissioner had issued a notice of default that had become a final order of the Commissioner when the employer failed to seek an appeal.

In support of his position in this matter, Mr. Edens also cites *Canterbury v. Valley Bell Dairy Co.*, 142 W.Va. 154, 95 S.E.2d 73 (1956). In *Canterbury*, this Court reviewed the question of whether an employer had lost is workers' compensation immunities and defenses because the employer had failed to report as wages certain sums paid an employee by the employee's co-worker. 142 W.Va. at 155, 95 S.E.2d at 74. The employer in *Canterbury* had paid certain employees, working as helpers to its truck drivers, a very minimal wage and had paid workers' compensation premiums based only upon those wages. The drivers who were assisted by the helpers often paid the helpers an additional stipend, presumably drawn from their own wages. This additional compensation was not reported as wages for the helpers, nor was any premium paid by the employer on that supplemental compensation. When one of the helpers was killed in a workplace accident, his personal representative brought a wrongful death action against the employer, claiming that the employer had lost it workers' compensation immunities and defenses. In the lower court, a verdict was returned and a judgment rendered based upon a determination that the immunities and defenses had been lost. This Court reversed the lower court judgment, finding that the supplemental payments by the drivers to the helpers were not wages paid by the employer. *Id.* at 159, 95 S.E.2d at 76. This Court did not, however, address the question of whether the procedure employed in the lower court for the determination of the issue of whether workers compensation coverage had been lost was proper.

The wage reporting matter at issue in *Canterbury* directly concerned the injured employee, the individual whose wages, workplace injury, and death were directly involved in the civil action reviewed by this Court. Conversely, in the case sub judice, the allegedly improper compliance with the Workers' Compensation Act does not relate directly to the injured employee, Mr. Edens, but rather to the contested status of a co-worker not involved in the underlying civil action.

In *Kosegi v. Pugliese*, 185 W.Va. 384, 407 S.E.2d 388 (1991), this Court recognized the statutory pronouncements "that an employer who is in default of its obligation to remit workers' compensation premiums to the Fund is *not* entitled to immunity from common-law liability." 185 W.Va. at 386, 407 S.E.2d at 390. In exploring that issue, however, the *Kosegi* Court also acknowledged an intervening alteration in the statutory procedure for the potential loss of immunity which had been accomplished after the employee's death in 1982. This Court explained as follows:

> [Employer's] sole basis for contesting that they were statutorily in default for failure to remit premium payments is the 1984 amendment to W.Va.Code § 23–2–5. The provisions of W.Va.Code § 23–2–5 as in effect in 1982 required that an employer who was delinquent in the payment of workers' compensation premiums "shall be deprived of the benefits and protection afforded by this chapter . . . ." Pursuant to

the 1982 statute, an employer whose failure to timely remit premiums rendered him delinquent ... was thereby mandatorily subjected to common-law negligence. *Id.* at 386–87, 407 S.E.2d at 390–91. Pursuant to the 1982 statute, the "commissioner was not required to notify an employer that its delinquency rendered it in default...." *Id.* at 387, 407 S.E.2d at 391. However, the amendment of 1984 included a requirement that the commissioner must notify all delinquent employers in writing of "their failure to timely pay premiums, to timely file a payroll report, or to maintain an adequate premium deposit." *Id.* at 87, 407 S.E.2d at 391, *quoting* W.Va.Code § 23–2–5(b) (1984). The amendment also provided that failure to resolve a delinquency within a prescribed period would place the account in default. The *Kosegi* Court refused to apply the 1984 amendments retrospectively to the 1982 employee death and therefore held that the employer's failure to pay appropriate premiums at the time of the incident rendered the employer in default and dispossessed it of its statutory immunity.[13]

■ Those 1984 amendments, applicable in the present case, substantially changed the process by which a delinquent employer may now be found in default, with the resultant loss of immunities and common law defenses. In the case before us, no delinquency or default of the employer has been found or declared by the Workers' Compensation Commission.

In resolving the case before us, we find instructive the analysis utilized by the Supreme Court of Ohio in addressing the issue of entitlement to statutory immunity through a workers' compensation system. That court has recognized the obligation of the judiciary to observe statutory protocol when evaluating issues of delinquency and default. In *Bridges v. National Engineering and Contracting Co.,* 49 Ohio St.3d 108, 551 N.E.2d 163 (1990), the Ohio Supreme Court held that a certificate of coverage served to demonstrate that the employer was in compliance as a matter of law, reasoning as follows in syllabus point two: "Once the Industrial Commission has certified that an employer has established industrial coverage and paid its premium, pursuant to R.C. 4123.35, the employer is a complying employer as a matter of law, and is entitled to the benefits of [the workers' compensation act]." 551 N.E.2d at 164. Further, in syllabus point three, the *Bridges* court held that "[a]n employer's failure to include a particular injured employee in a required payroll report does not deprive the employer of its statutory immunity from a civil action brought by the employee, in the absence of a final determination by the commission that the employer is a noncomplying employer who has not settled its liability to the State Insurance Fund." *Id.*

The employees in *Bridges* had argued "that certificates of premium payment are only prima facie evidence that the proper premium has been paid, and thus evidence showing an employer under-reported its payroll, as they allege [the employer] did here,

---

**13.** Three days after the *Kosegi* decision was filed, this Court filed *Shifflett v. McLaughlin,* 185 W.Va. 395, 407 S.E.2d 399 (1991), and held that an employer who failed to pay workers' compensation premiums for part-time employees was delinquent and was mandatorily deprived of its statutory immunity for an accident which occurred in 1983. As in *Kosegi,* the employer maintained that it could not lose immunity because no notice of delinquency was provided. 185 W.Va. at 396, 407 S.E.2d at 400. This Court again explained that the provisions in effect in 1983 permitted immediate loss of immunity upon delinquency with no requirement of notice or opportunity to resolve and held that the employer would not be entitled to retroactive application of the subsequently-enacted 1984 notice provisions. In footnote nine of *Shifflett,* this Court queried as follows:

> We question how, under the new statute requiring notice, the commissioner can give notice of delinquency to an employer who is not reporting all employees, such as were the facts in this case. The commissioner would have no way of knowing that the employees were not being reported to the Fund until perhaps an accident would occur. Then, under the new statute, the employer could claim no notice was given of the delinquency.

185 W.Va. at 399 n. 9, 407 S.E.2d at 403 n. 9. We note that the statutory and regulatory provisions regarding audits and investigative tools available to the Commission serve to minimize instances in which employer error will remain undiscovered. *See* W.Va.Code § 23–5–1(a), as discussed above.

proves noncompliance...." 551 N.E.2d at 169–70. The Ohio Supreme Court rejected that argument and reasoned as follows:

> While the accuracy of a premium payment by an employer is certainly dependent upon the accurate reporting of payroll by such employer, an employer who fails to fully pay its premiums does not *automatically* become a noncomplying employer subject to a common-law action by its employees. Indeed, once an employer has filed a payroll report, whether complete or not, and paid the premium thereon, a finding of noncompliance is a question of fact to be determined in the first instance by the Industrial Commission, not by a court in an original civil action.

*Id.* at 170. The *Bridges* court also noted that the statutory scheme included safeguards which ensure that "[a]s between the employer and the commission ... the certificate is *not* conclusive." *Id.* All records under the Ohio system, as in the West Virginia system, are subject to audit by the commission. "Moreover, the determination of an employer's failure to comply ... is an administrative determination." *Id.* The *Bridges* court ultimately explained that "we agree with the holding of several lower courts that, standing alone, the failure of an employer who has otherwise complied to include one or more employees on a payroll report 'is not an omission which will deprive an employer or immunity.'" *Id.* at 170–71 (citations omitted). The employer's "omission of its Bridge Project employees from its payroll reports was a matter between it and the commission...." *Id.* at 171. "Whether [the employer] had a duty to report such employees' payroll is a matter to be decided, in the first instance, by the commission." *Id.; see also Keeler v. Schroeder,* 1992 WL 19361 (Ohio App.1992).

Relying upon the principles enumerated in *Bridges,* the Court of Appeals of Ohio held that a certificate of payment "served to demonstrate the [employer] was a complying employer as a matter of law." *Fuhrman v. Garrison Feist Const. Co.,* 2000 WL 1838031, 4 (Ohio App.2000). The *Fuhrman* court reasoned as follows:

Moreover, we reject the [plaintiffs'] contention that, had they been permitted to discover and present as evidence the results of the [workers' compensation] audit, they could have rebutted [the employer's] proof of compliance, because the audit results would have served as a "final determination" of noncompliance. As the court's discussion of the audit process in *Bridges* details, an audit revealing inaccurate payroll reporting or underpayment of premiums by an employer does not alone mean that the employer is "noncomplying" for the purposes of statutory immunity. Rather, an employer becomes noncomplying for the purposes of statutory immunity only after it fails to pay, within the allowed time, the additional premium ordered as the result of the audit.

2000 WL 1838031 at *5; *see also Walter v. AlliedSignal, Inc.,* 131 Ohio App.3d 253, 722 N.E.2d 164, 169 (1999).

## IV. Conclusion

 The Petitioner requests a writ of prohibition preventing the lower court from seeking jury resolution of this matter. In support of its request, the Petitioner contends that no genuine issue of material fact remains for resolution and that summary judgment on the issue of workers' compensation coverage is appropriate at this stage. We agree with the Petitioner's contentions and grant the requested relief. We base this determination upon the elaborate statutory and regulatory provisions summarized above, our duty to adhere to such provisions, and the inescapable conclusion that even if the allegations advanced by Mr. Edens were accurate and proven before a jury, the first penalty to be suffered by the Petitioner would be a finding that it owes further premiums and that its account should be designated as delinquent. Pursuant to statute, a notice of delinquency would then be issued, and the Petitioner would be given an opportunity to cure the delinquency. If no resolution of the delinquency occurred within statutory time frames, a default would result.

Further, we observe that the certificate issued to the Petitioner covered the time period in which the accident occurred; there

is no evidence of challenge, amendment, or revocation to that certificate; the statutory procedure clearly identifies the stages through which a default determination must proceed administratively; and the injured worker's own workers' compensation benefits are not jeopardized, his wages were properly reported with premiums paid thereon, and the alleged error by the Petitioner involves classification of an employee other than the injured worker in question.

Providing due regard to the legislative plan for addressing perceived delinquencies and eventual defaults in the obligations of employers to file accurate workers compensation reports and fully pay all premiums due on the wages reported, it is apparent that the legislative scheme allows a reasonable means of addressing both errors and oversights which might arise in the preparation and filing of such reports and the calculation and payment of appropriate workers' compensation premiums. The procedure specified by the legislature allows for the correction of errors in the wage report arising from the omission of an individual employee, the misstatement of actual wages earned, or even a good faith dispute regarding the proper classification of a particular person to whom compensation might have been paid. Certainly, the legislative scheme does not envision that an error in the wage report, such as the omission of an individual employee by simple, unintended error, or the misstatement of a wage by computational or scrivener error, would immediately result in the loss of coverage, immunities, and defenses. Such error of law or fact, as in the case of adjudging an employee to be an independent contractor, would not trigger the loss of coverage, immunities, and defenses without the opportunity to litigate the issue with the Workers' Compensation Commission and to pay any delinquency upon an adverse finding. In the absence of a procedure for preliminary notification of a delinquency and eventual declaration of a default, such as the legislature has devised, even the most innocent, accidental errors could be the basis for denying workers' compensation coverage to

an employer. This is not the intent of the legislative scheme.

Submission of a question to a jury is necessary only when there is a genuine issue of material fact to be decided. As Rule 56(c) of the West Virginia Rules of Civil Procedure specifies, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A material fact has been defined as one "that has the capacity to sway the outcome of the litigation under the applicable law." *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 60 n. 13, 459 S.E.2d 329, 337 n. 13.[14] "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Finding no justification for the lower court's proposed action, we conclude that there is no basis upon which this Court or the trial court may deprive the Petitioner of its immunity or defenses from suit for common law negligence and no genuine issue of material fact which might warrant submission of this matter to a jury. The writ shall be granted prohibiting litigation of the issue of the Petitioner's workers' compensation coverage in the civil action pending below and prohibiting maintenance of an action under the allegations of Count II of Mr. Edens' complaint.

Writ Granted.

Chief Justice MAYNARD, Justice DAVIS and Justice STARCHER concur and reserve the right to file concurring opinions.

Justice McGRAW dissents and reserves the right to file a dissenting opinion.

DAVIS, Justice concurring:

In this proceeding the majority opinion has issued a writ of prohibition that prevents the circuit court from allowing John Edens (hereinafter referred to as "Mr. Edens")

---

**14.** "When a party cannot show a material fact issue, there is nothing to submit to a jury[.]"

*Lattrell v. Chrysler Corp.*, 79 S.W.3d 141, 150 (Texas App.2002).

from pursuing a common law cause of action against Abraham Linc Corporation (hereinafter referred to as "Abraham Linc"). I concur in the decision to issue the writ. However, as illustrated below, I believe the writ should have issued for another reason.

## A. Raising the Issue of Standing Sua Sponte

Mr. Edens sought to litigate a common law negligence action against his employer, Abraham Linc, on the theory that Abraham Linc's workers' compensation account was in default because it failed to pay premiums on behalf of another employee, Don Johnson (hereinafter referred to as "Mr. Johnson"). Neither party raised below, or in this proceeding, the issue of whether or not Mr. Edens had standing to litigate the employment status of Mr. Johnson. We have previously noted that " '[s]tanding is an element of jurisdiction over the subject matter.' " *State ex rel. Paul B. v. Hill*, 201 W.Va. 248, 256, 496 S.E.2d 198, 206 (1997) (quoting 21A Michie's Jurisprudence Words & Phrases 380 (1987)). Further, "[s]tanding is a jurisdictional requirement that cannot be waived, and may be brought up at any time in a proceeding." Franklin D. Cleckley, Robin Jean Davis & Louis J. Palmer, *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 12(b), p. 21 (Supp.2004). The decisions of this Court and other jurisdictions have pointed out that an appellate court has the inherent authority and duty to *sua sponte* address the issue of standing, even when the parties have failed to raise the issue at the trial court level or during a proceeding before the appellate court. *See State ex rel. Youngblood v. Sanders*, 212 W.Va. 885, 894, 575 S.E.2d 864, 875 (2002) (Davis, J., concurring) ("[T]his Court ha[s] the authority and the duty to address the issue of standing ... *sua sponte*."); Syl. pt. 2, in part, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995) ("Where neither party to an appeal raises, briefs, or argues a jurisdictional question presented, this Court has the inherent power and duty to determine unilaterally its authority to hear a particular case. Parties cannot confer jurisdiction on this Court directly or indirectly where it is otherwise lacking.").[1] It is my opinion that this Court should have *sua sponte* invoked the issue of standing, and resolved this case on that issue.

## B. General Standing Principles

This Court has indicated that "[g]enerally, standing is defined as '[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.' " *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 94, 576 S.E.2d 807, 821 (2002) (quoting Black's Law Dictionary 1413 (7th ed.1999)). Ultimately, "the question of standing is whether

1. *See also FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 230–231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("Neither the District Court nor the Court of Appeals determined whether petitioners had standing to challenge any particular provision of the ordinance. Although neither side raises the issue here, we are required to address the issue even if the courts below have not passed on it, and even if the parties fail to raise the issue before us."); *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir.2004) ("[Appellant] claims that the issue of standing is not before this court because the district court did not dismiss on that basis. As a jurisdictional requirement, however, standing can be raised by the court *sua sponte* at any time during the litigation."); *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1367 (Fed.Cir.2003) ("It is well-established that any party, and even the court *sua sponte*, can raise the issue of standing for the first time at any stage of the litigation[.]"); *Rector v. City & County of Denver*, 348 F.3d 935, 942 (10th Cir. 2003) ("Standing ... raises jurisdictional questions and we are required to consider the issue *sua sponte* [.]"); *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–332 (5th Cir.2002) (Although ... standing was not raised by the parties or considered by the district court, we must—where necessary—raise it *sua sponte*."); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1056 (9th Cir.2002) ("We also hold that appellants do not have standing to seek declaratory relief. We raise this standing issue *sua sponte*, as the law requires."); *Chong v. District Director, I.N.S.*, 264 F.3d 378, 383 (3rd Cir.2001) ("[C]ourts must decide ... standing issues, even when not raised by the parties, before turning to the merits."); *S.E.C. v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 665 (6th Cir.2001) ("The litigants in the present case have not raised the issue of the movants' standing to appeal the orders of the district court, but we raise this issue, *sua sponte*, because we are under an independent obligation to police our own jurisdiction."); *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1275 (11th Cir. 2000) ("We are obliged to consider standing *sua sponte* even if the parties have not raised the issue.").

the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *See also Flast v. Cohen,* 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) ("In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue[.]"). Furthermore, "standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." *International Primate Protection League v. Administrators of Tulane Educ. Fund,* 500 U.S. 72, 77, 111 S.Ct. 1700, 1704, 114 L.Ed.2d 134 (1991).

The decisions of this Court have recognized two types of standing inquiries. First, the issue of standing may be presented in the context of a litigant asserting an alleged right that is unique to him or her. This is known "as first party standing[.]" *Romano v. Harrington,* 664 F.Supp. 675, 679 (E.D.N.Y.1987). In this specific context, we articulated the elements for establishing standing in syllabus point 5 of *Findley* as follows:

> Standing is comprised of three elements: First, the party attempting to establish standing must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete and particu-

larized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.

213 W.Va. 80, 576 S.E.2d 807.[2]

The second context in which standing may be analyzed occurs when a litigant seeks to assert the rights of a third party. This standing issue "is also commonly known as *jus tertii* standing." *Pennsylvania Psych. Soc. v. Green Spring Health Servs., Inc.,* 280 F.3d 278, 287 n. 7 (3rd Cir.2002). In this situation "[i]t is a well-established rule that a litigant may assert only his own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties."[3] *Coalition of Clergy, Lawyers, and Professors v. Bush,* 310 F.3d 1153, 1163 (9th Cir.2002). We have previously noted that

> [t]raditionally, courts have been reluctant to allow persons to claim standing to vindicate the rights of a third party on the grounds that third parties are generally the most effective advocates of their own rights and that such litigation will result in an unnecessary adjudication of rights which the holder either does not wish to assert or will be able to enjoy regardless of the outcome of the case.

**2.** The requirements for first party standing are "constitutional requirements[.]" *Granite State Outdoor Advertising, Inc. v. City of Clearwater, Fla.,* 351 F.3d 1112, 1116 (11th Cir.2003). Justice Cleckley stated in *Coleman v. Sopher,* "Section[s] 3 [and 6] of Article VIII of the West Virginia Constitution refer[ ] to the word 'controversy[.]' One of the incidents of [the] controversy requirement is that a litigant have 'standing[.]' " 194 W.Va. 90, 95 n. 6, 459 S.E.2d 367, 373 n. 6 (1995).

**3.** The rule that prohibits a party from litigating the rights of another is a prudential standing rule that is not constitutionally based. *See American Fed'n of Gov't Employees, AFL–CIO v. Rumsfeld,* 321 F.3d 139, 142 (D.C.Cir.2003) ("Prudential standing, unlike Article III standing, is based not on the Constitution, but instead on prudent judicial administration." (internal quotation marks and citation omitted)). There are three generally recognized prudential standing rules: "the general prohibition on a litigant's raising another

person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Further, it has been appropriately noted that " '[p]rudential standing limitations help courts identify proper questions of judicial adjudication, and further define the judiciary's role in the separation of powers.' " *McClure v. Ashcroft,* 335 F.3d 404, 411 (5th Cir.2003) (quoting *Ruiz v. Estelle,* 161 F.3d 814, 829 n. 22 (5th Cir.1998)). However, "[p]rudential standing concerns, unlike constitutional ones, can be abrogated by an act of [the legislature]." *McInnis–Misenor v. Maine Med. Ctr.,* 319 F.3d 63, 68 (1st Cir.2003). That is, the legislature "may grant an express right of action to persons who otherwise would be barred by prudential standing rules." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

*Snyder v. Callaghan,* 168 W.Va. 265, 279, 284 S.E.2d 241, 250 (1981) (citation omitted). *See also State ex rel. Leung v. Sanders,* 213 W.Va. 569, 578, 584 S.E.2d 203, 212 (2003) (per curiam) ("In light of our clear and long-standing precedent against third-party standing, the circuit court committed clear legal error in permitting Ms. Schell to litigate Dr. Wanger's and Shenandoah's potential rights." (footnote omitted)); *Board of Educ. of County of Taylor v. Board of Educ. of County of Marion,* 213 W.Va. 182, 189, 578 S.E.2d 376, 383 (2003) ("To the extent that the transfer request form used by the Marion County Board contains a similar clause, the Taylor County Board is simply without standing to seek its enforcement."); *Kessel v. Leavitt,* 204 W.Va. 95, 117, 511 S.E.2d 720, 742 (1998) ("[W]e discern [no] authority to permit a defendant [standing] to challenge the personal jurisdiction of a codefendant when that codefendant, by his/her acts or omissions, has waived his/her right to challenge such personal jurisdiction."); *Guido v. Guido,* 202 W.Va. 198, 203, 503 S.E.2d 511, 516 (1998) (per curiam) ("In the instant matter it is quite clear that Mr. Guido lacks standing to bring any appeal issues which directly involve his parents. He has no justiciable interest in the claims of his parents."); *West Virginia AAA Statewide Ass'n v. Public Serv. Comm'n of West Virginia,* 186 W.Va. 287, 288 n. 3, 412 S.E.2d 481, 482 n. 3 (1991) ("Because appellant is not an entity who is subject to the tariffs at issue, AAA does not have standing to raise procedural issues pertaining to a PSC-administered rate increase.").

While this Court has recognized exceptions to the general rule that a litigant may not assert the rights of a third party, we have never articulated a general *jus tertii* standing test for determining whether a litigant may assert the rights of a third party. *See, e.g., Local Div. No. 812 of Clarksburg, W. Va., of Amalgamated Transit Union v. Central West Virginia Transit Auth.,* 179 W.Va. 31, 34 n. 2, 365 S.E.2d 76, 79 n. 2 (1987) ("[L]abor organization may sue or be sued as an entity and in behalf of the employees whom it represents."); Syl. pt. 2, *Snyder v. Callaghan,* 168 W.Va. 265, 284 S.E.2d 241 (1981) ("An association which has suffered no

injury itself, but whose members have been injured as a result of the challenged action, may have standing to sue solely as the representative of its members when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); Syl. pt. 2, *Shobe v. Latimer,* 162 W.Va. 779, 253 S.E.2d 54 (1979) ("For standing under the Declaratory Judgments Act, it is not essential that a party have a personal legal right or interest."); *Tug Valley Recovery Ctr., Inc. v. Mingo County Comm'n,* 164 W.Va. 94, 103, 261 S.E.2d 165, 170–171 (1979) (holding that any interested resident or taxpayer has standing to contest assessment of land not belonging to him or her). Because of the facts presented in the instant case, I believe the Court was obligated to set out a general test for determining when a litigant may assert the rights of a third party.

### C. Jus Tertii Standing Principles

Federal courts have adopted a three pronged *jus tertii* standing test to determine whether a litigant may assert the rights of a third party. In *Powers v. Ohio,* the United States Supreme Court succinctly set out the three pronged test that was developed in its prior decisions: "[t]he litigant must have suffered an injury in fact ...; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests." 499 U.S. 400, 411, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991) (internal quotations and citations omitted). *See also Lepelletier v. F.D.I.C.,* 164 F.3d 37, 43 (D.C.Cir.1999) (applying test in civil case); *Mount Elliott Cemetery Ass'n v. City of Troy,* 171 F.3d 398, 404 (6th Cir.1999) (applying test in civil case); *Wauchope v. United States Dep't of State,* 985 F.2d 1407, 1411 (9th Cir.1993) (applying test in civil case); *Freilich v. Board of Directors of Upper Chesapeake Health, Inc.,* 142 F.Supp.2d 679, 699 (D.Md.2001) (applying test in civil case); *Moreno v. G & M Oil Co.,* 88 F.Supp.2d 1116, 1118 (C.D.Cal.2000) (applying test in civil case); *Clark v. State,* 585 So.2d 249, 250

(Ala.Crim.App.1991) (applying test in criminal case); *People v. Morris,* 107 Cal.App.4th 402, 131 Cal.Rptr.2d 872, 879 (2003) (applying test in criminal case); *Alterra Healthcare Corp. v. Estate of Shelley,* 827 So.2d 936, 941 (Fla.2002) (applying test in civil case); *State v. Velez,* 588 So.2d 116, 125 (La.Ct.App.1991) (applying test in criminal case); *New Mexico Right to Choose/NARAL v. Johnson,* 126 N.M. 788, 975 P.2d 841, 847 (1998) (applying test in civil case); *New York County Lawyers' Ass'n v. Pataki,* 188 Misc.2d 776, 727 N.Y.S.2d 851, 856 (2001) (applying test in civil case); *State v. Orwick,* 153 Ohio App.3d 88, 791 N.E.2d 463, 466 (2003) (applying test in criminal case); *Gray's Disposal Co., Inc. v. Metropolitan Gov't of Nashville,* 122 S.W.3d 148, 158 (Tenn.Ct.App.2002) (applying test in civil case); *Salazar v. State,* 818 S.W.2d 405, 408 (Tex.Crim.App.1991) (applying test in criminal case).

Under the first prong of the *Powers* test, "it is only possible to find third party standing when there is also an injury in fact alleged by the first party plaintiff." *Storino v. Borough of Point Pleasant Beach,* 322 F.3d 293, 299 (3rd Cir.2003). Thus, a party must show that he or she "suffered a concrete injury[.]" *Wauchope v. United States Dep't of State,* 985 F.2d 1407, 1411 (9th Cir. 1993). To satisfy the second prong of *Powers* a litigant must show that "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue, ... [or] the relationship between the litigant and the third party [is] such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Singleton v. Wulff,* 428 U.S. 106, 114–15, 96 S.Ct. 2868, 2874, 49

L.Ed.2d 826 (1976). Under the third prong of *Powers,* it must be shown that "there is some genuine obstacle to [the third party's] assertion [of his rights.]" *Singleton,* ·128 U.S. at 116, 96 S.Ct. at 2875.

I believe that the *Powers* factors are sound for assessing whether a litigant may assert the rights of a third party. Therefore, I believe the following principle of law should have been adopted in this case: The *jus tertii* standing requirements that must be established by a litigant seeking to assert the rights of a third party are: (1) the litigant must have suffered an injury-in-fact; (2) the litigant must have a close relation to the third party; and (3) there must exist some hindrance to the third party's ability to protect his/her own interests.

### D. Applying Jus Tertii Standing Principles to Mr. Edens' Attempt to Litigate the Rights of a Third Party

Mr. Edens sought to litigate a common law negligence claim against Abraham Linc, under the theory that Abraham Linc was in default with the Workers' Compensation Commission at the time of his injury. The record is clear that the sole basis upon which Mr. Edens relies, in order to show that Abraham Linc was in default, involves the employment status of Mr. Johnson. Indeed, the circuit court expressly found that "an issue of material fact exists as to whether Don Johnson ... was an 'employee' or 'independent contractor.'" I believe that the employment status of Mr. Johnson is an issue that *Mr. Johnson* may have standing to litigate, if he is injured while working for Abraham Linc.[4] *See Shifflett v. McLaughlin,* 185 W.Va. 395,

---

4. I will also note that, in addition to attempting to litigate Mr. Johnson's rights, Mr. Edens is also attempting to litigate rights of the Workers' Compensation Commission. That is, to the extent that Abraham Linc should have categorized Mr. Johnson as an employee and paid workers' compensation premiums accordingly, the Workers' Compensation Commission was injured and is statutorily empowered to seek redress. *See* W. Va.Code § 23–1–19(a) (2003) (Spec.Supp.2003) ("Any ... corporation ... which willfully, by means of false statement or representation, or by concealment of any material fact, ... obtains ... reduced premium costs ... shall be liable to the workers' compensation commission in an amount equal to three times the amount of such benefits, payments or allowances to which he or

it is not entitled[.]"); W. Va.Code § 23–2–5a(a) (2003) (Spec.Supp.2003) ("The workers' compensation commission ... may commence a civil action against an employer who, after due notice, defaults in any payment required by this chapter."). Obviously, I am concerned about the possibility that the rights of Mr. Johnson and the Workers' Compensation Commission may be in jeopardy. However, " '[b]ecause the judiciary's primary role ... is to adjudicate the rights of the private parties before it, the mere fact that the ... rights of third parties may be in jeopardy provides no justification for judicial intervention.' " *Cole v. Oroville Union High Sch. Dist.,* 228 F.3d 1092, 1099 (9th Cir.2000) (quoting Note, "Standing to Assert Constitutional Jus Tertii," 88 Harv. L.Rev. 423, 429 (1974)).

407 S.E.2d 399 (1991) (per curiam) (where the estate of the decedent, who had been a part-time employee, was allowed to maintain a common law negligence action against the employer because the employer failed to pay workers' compensation premiums specifically on behalf of the decedent).[5] Insofar as Mr. Edens seeks to litigate rights that Mr. Johnson may have, i.e., the right to be categorized as an employee and the right to enjoy workers' compensation benefits flowing therefrom, I believe Mr. Edens must satisfy *jus tertii* standing requirements.[6]

Applying the *jus tertii* standing requirements to the facts of this case, I need go no further than the first requirement. In order for Mr. Edens to litigate the employment status of Mr. Johnson, he must establish an injury-in-fact that flows from Mr. Johnson's employment status as an independent contractor. This he cannot do.

In this proceeding there are no allegations that Abraham Linc failed to inform the Workers' Compensation Commission that Mr. Edens was an employee. There is no dispute that after Mr. Edens was injured he obtained workers' compensation benefits. Mr. Edens was covered by Abraham Linc's compliance with the reporting and premium payment requirements of the Workers' Compensation Commission.[7] Consequently, the fact that Abraham Linc listed Mr. Johnson as an independent contractor and paid no workers' compensation premiums on his behalf did not cause an injury-in-fact to Mr.

Edens. "Absent specific facts establishing distinct and palpable injuries fairly traceable to [Mr. Johnson's employment status], [Mr. Edens] cannot satisfy [his] burden at the summary judgment stage to establish the injury in fact requirement for [jus tertii] standing[.]" *Arkansas ACORN Fair Housing, Inc. v. Greystone Dev., Ltd. Co.,* 160 F.3d 433, 435 (8th Cir.1998). Thus, Mr. Edens does not have *jus tertii* standing on the dispositive issue that would permit a common law negligence action to proceed against Abraham Linc. Under these circumstances, Abraham Linc is entitled to the writ. *See Burke v. City of Charleston,* 139 F.3d 401, 405 n. 2 (4th Cir.1998) ("[J]us tertii plaintiff is obligated as an initial matter to [establish] a distinct and palpable injury[.]").

In view of the foregoing, I concur.

McGRAW, Justice, dissenting:

(Filed July 2, 2004)

As alleged in the underlying action, John Edens, an employee of Abraham Linc Corporation, suffered a catastrophic injury as a result of the actions of a co-worker. The co-worker had been working for Abraham Linc for approximately 1 year and had been performing the same duties as the other employees on the premises. Abraham Linc never included the co-worker's wages in the determination of its premiums for workers' compensation purposes. Thus, a dispute arose concerning whether Abraham Linc was in default under the Workers' Compensation

---

5. *See also Erie Ins. Property and Cas. Co. v. Stage Show Pizza, JTS, Inc.,* 210 W.Va. 63, 553 S.E.2d 257 (2001) (noting that employer was in default of its obligations to the workers' compensation fund for failure to pay premiums on the date the plaintiff was injured.); *State ex rel. Frazier v. Hrko,* 203 W.Va. 652, 510 S.E.2d 486 (1998) (where injured employee was allowed to maintain common law negligence action against employers after Workers' Compensation Commission issued orders declaring employers were in default on the date employee was injured); *Kosegi v. Pugliese,* 185 W.Va. 384, 407 S.E.2d 388 (1991) (estate of the decedent allowed to maintain a common law negligence action against the employer, because the employer failed to pay *any* workers' compensation premiums during the period decedent was killed).

6. I have carefully examined the workers' compensation statutes. I have found no statutory

provision giving an employee the right to litigate the employment status of another worker for the purpose of proving an employer was in default for failing to make premium payments on behalf of the other worker.

7. We are aware that workers' compensation benefits cannot be denied merely because an employer failed to make required premium payments. *See* W. Va.Code § 23–2–5(g) (2003) (Spec.Supp.2003) ("[N]o employee of an employer required by this chapter to subscribe to the workers' compensation fund shall be denied benefits provided by this chapter because the employer failed to subscribe or because the employer's account is either delinquent or in default."). However, in this case there is no dispute that premium payments were made that reflected Mr. Edens' status as an employee.

Act, the resolution of which is dependent upon the factual question of whether the co-worker was an employee of Abraham Linc or an independent contractor. The accident occurred in April 2001, and, as of yet, the Workers' Compensation Commissioner has not addressed this situation other than to issue a perfunctory Certificate of Coverage at Abraham Linc's request. Contrary to the view of the majority, I am of the opinion that much of this dilemma can be resolved by adherence to *State ex rel. Frazier v. Hrko,* 203 W.Va. 652, 510 S.E.2d 486 (1998). I, therefore, respectfully dissent.

Syllabus point 2 of *Frazier* holds, in part, that "[u]nder *W.Va.Code,* 23–2–5(d) [1986], in the absence of a final ruling by the Workers' Compensation Commissioner, a trial court may find an employer in default under the Workers' Compensation Act." Specifically, *Frazier* indicates that a Circuit Court may find an employer in default as a matter of law and, where necessary, submit questions of fact to the jury. 203 W.Va. at 660, 510 S.E.2d at 494.[1] That aspect of *Frazier,* however, is not discussed by the majority in this case, and, inasmuch as it is at odds with the majority opinion, *Frazier* is, therefore, overruled by implication.

The ultimate question of whether an employer is in default under the Workers' Compensation Act, and has lost the protections afforded by the Act from a common law action for negligence, is a matter of law which may, in limited circumstances, involve attendant questions of fact, such as whether a worker was an employee of the employer or an independent contractor. In that regard, I would clarify *Frazier* by stating that, in the absence of a final ruling by the Workers' Compensation Commissioner, a circuit court may make the legal determination of whether the employer is in default under the Act. If a genuine issue of material fact exists concerning whether a worker was an employee or independent contractor, that issue may be submitted to a jury to facilitate the circuit

court's ultimate ruling. The utilization of such a procedure, where no action has been taken by the Commissioner, would eliminate the concern expressed by the majority that simple, unintended errors could result in the loss of an employer's immunity.

The statutory and regulatory process described in the majority opinion constitutes the Legislature's concept of a fair method for an administrative determination of whether an employer's account is delinquent or in default. That method, however, is ineffective if the Commissioner takes no action in the first instance. As the majority acknowledges, until an accident occurs, the Commissioner may not have known that employees were not being reported to the Fund. Such circumstances support the reasoning in *Frazier.*

In the underlying action, Abraham Linc obtained a Certificate of Coverage from the Commissioner stating that its premium account was in good standing during the period in question. The majority opinion emphasizes the Certificate as an important, if not dispositive, factor in the ultimate determination of whether Abraham Linc was in default. However, the Certificate contains the following limiting language:

> As of the date indicated, this account of the named insured employer is in good standing with the Division. This certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policy below.

The existence of the Certificate of Coverage would not warrant the foreclosure of a legal or factual inquiry concerning the status of the Abraham Linc account. In any event, the Certificate could be considered at the Circuit Court level, under *Frazier,* along with other relevant matters concerning default.

---

1. As the *Frazier* opinion states:
 We believe that, under *W.Va.Code,* 23–2–5(d) [1986], when an employer fails to file payroll reports, and in the absence of any rulings by the Commissioner concerning such failure, an employer may be held to be in default as a

 matter of law if no questions of material fact exist. A trial court may submit the question to a jury if the Commissioner has made no determination of an employer's default and the material facts are in dispute. 203 W.Va. at 660, 510 S.E.2d at 494.

Finally, the majority opinion suggests that John Edens, the plaintiff in the underlying action, cannot raise the default issue because he lacks standing to contest the employment classification of his co-worker, in terms of the payment of workers' compensation premiums. I am of the opinion that such a result is contrary to public policy. To a great extent, the success of any workers' compensation system depends upon the compliance of employers in accurately reporting wages and in paying premiums into the workers' compensation fund. The result of such compliance, or noncompliance, has a wide-ranging effect—from the individual employee to the economics of the entire region. Therefore, virtually any citizen should have standing to assert that an employer is not in compliance with the Workers' Compensation Act.

Moreover, where the Commissioner has taken no action, and no action is forthcoming, it is unfair to conclude that an employee who suffered a catastrophic injury from the actions of a co-worker has no standing to assert that the employer forfeited its immunity from a common law action for negligence, especially since: (1) the employee's standing would not have been an issue had the Commissioner taken action and found a default and (2) other employees, injured without the involvement of a co-worker, would be free, according to the majority, to pursue the default issue. Those distinctions from the circumstances of the injured employee in this case are not found in the West Virginia Workers' Compensation Act and constitute "too tenuous a premise upon which to anchor any steady standard of law." *State ex rel. J.L.K. v. R.A.I.*, 170 W.Va. 339, 346, 294 S.E.2d 142, 149 (1982).

STARCHER, Justice concurring:

"[S]tanding is a complex doctrine, defying generalizations and analytical structuring." Martha Colhoun and Timothy Hamill, "Environmental Standing in the Ninth Circuit: Wading through the Quagmire," 15 Pub. Land L.Rev. 249, 279 (1994).

I concur in the Court's *per curiam* opinion. I write separately to express another perspective on the issue of standing that is raised in the concurring opinion filed by Justice Davis.

In certain factual situations, the kind of tripartite analytic formulation set forth in *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) may be useful to a court in dealing with a standing issue. But there are several strong reasons not to use this analysis in the instant case, and not to adopt this approach as a black-letter principle of West Virginia law. I will briefly discuss those reasons.

The first reason is specific to the instant case—the fact that the issue of standing was not raised or briefed by either of the parties.

The concurrence is correct in stating that this Court can reach such an issue *sua sponte.* In some cases—particularly where there is settled law to apply—*sua sponte* action is appropriate. But what this Court almost never should do is to take up an issue that has not been briefed or argued, and then proceed to alter the basic law of the State—without the opportunity for either the litigants or the many members of the Bar and public who follow this Court's work to weigh in on the subject.

It is almost always the case that the competing voices and arguments of well-prepared, zealous advocates on all sides of an issue that has been raised in a concrete case permit this Court to craft decisions (and especially syllabus points) that will be enduringly useful. (That is one reason that we eschew advisory opinions.) To put forth a new "rule" without the benefit of advocacy or input from the public or the legal profession—especially a rule that would apply to a substantively wide range of cases—is not how the common law should be built.

Moreover—again focusing on the specific case that is before this Court—the *Powers* standing analysis, that focuses on "when one person can assert 'rights' belonging to another person," does not fit the facts of the instant case.

The plaintiff in the instant case argues that he was injured in a workplace where the worker's compensation laws were not being followed; and he also argues that there is a clear penalty prescribed by the Legislature for employers who do not follow the law—the loss of statutory immunity from suit.

The plaintiff is not attempting to get a right or benefit for or belonging to a "third party" (that party, in the instant case, would be the worker who injured the plaintiff and who was not listed with Worker's Compensation). Rather, the plaintiff is seeking a right or benefit *for himself*—namely, the ability to take advantage of the legislative penalty of the employer's loss of immunity.

In short, the facts of the instant case do not fit the "third party" standing situation that *Powers* addresses.

Next, going beyond the circumstances of the instant case, the adoption of the specific *Powers* formulation as a black-letter rule would likely be inappropriate and unhelpful for the development of our West Virginia law.

This is because *Powers* is a federal case, and its "third-party" prudential standing formulation is tied into the larger framework of federal court jurisdiction, a jurisdiction that is quite limited under the *United States Constitution*—and is quite different from the general jurisdiction of the sovereign States and their courts. Adopting the *Powers* formulation would tend to tie the development of our standing law to past and future standing decisions of the federal court decisions that are grounded in a fundamentally different jurisprudential soil.

Moreover, without going into an in-depth discussion of this complex area of law, suffice it to say that the recent federal decisions in the standing area have been seriously questioned by many scholars. For examples of such criticism, *see* Mendelson, Joseph, "Should Animals Have Standing? A Review of Standing Under the Animal Welfare Act," 24 B.C. Envtl. Aff. L.Rev. 795 (1997) (criticizing federal cases denying standing to persons seeking to prevent animal abuse); Milani, Adam, "Wheelchair Users Who Lack Standing: Another Procedural Threshold Blocking Enforcement of Titles II and III of the ADA," 39 Wake Forest L.Rev. 69, notes 61–83 (2004) (criticizing federal cases denying standing to persons challenging disability discrimination); Sheldon, Karin, "*Steel Company v. Citizens for a Better Environment:* Citizens Can't Get No Psychic Satisfaction," 12 Tul.Envtl.L.J. 1 (1998) (criticizing Su-

preme Court denial of standing to citizens challenging failure of company to file toxic chemical reports); King, Jason, "Standing in Garbage: Flow Control and the Problem of Consumer Standing," 32 Ga.L.Rev. 1227 (1998) (criticizing federal cases denying citizens standing to challenge garbage importation); Levy, Johnathan, "In Response to *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.:* Employment Testers Do Have a Leg to Stand On," 80 Minn. L.Rev. 123 (1995) (criticizing federal cases that undercut private enforcement of fair employment laws); Myriam E., "Representational Standing: *U.S. ex rel Stevens* and the Future of Public Law Litigation," 89 Cal.L.Rev. 315 (2001) (discussing the sharp cutback in public law litigation created by the Supreme Court's standing jurisprudence in the past 30 years); Kelso, Charles D. and R. Randall, "Standing to Sue: Transformations in Supreme Court Methodology, Doctrine, and Results," 28 U.Tol.L.Rev. 93 (1996) (describing the shifting and inconsistent standing rationales used by the Supreme Court in the 20th Century); Driesen, David, "Standing for Nothing: The Paradox of Demanding Concrete Context for Formalist Adjudication," 89 Cornell L.Rev. 808, 876 (2004) ("[S]tanding doctrine has never been applied consistently, as many critics have frequently noted.").

West Virginia has wrestled with standing issues in many contexts. We have come up with some sound decisions and principles of law that our courts have applied without noticeable trauma or drama to evaluate the often-competing concerns in this area. *See, e.g.,* the discussion and cases cited in *State ex rel. Leung v. Sanders,* 213 W.Va. 569, 584 S.E.2d 203 (2003) (*per curiam*). The concurrence lists some of our other decisions in this area; and notably, the concurrence identifies no error, inconsistency, or inadequacy in any of our past rulings or analytical formulations.

Simply put, no evidence or argument supports any need by this Court to adopt an additional Procrustean formulation to address standing issues.

Accordingly, I concur.

(Filed July 15, 2004)