Filed 5/21/14  P. v. Miller CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B245685 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA056182) |
| v. | |
| CHARLES M. MILLER et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Blanchard, Judge.  Affirmed.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant Charles M. Miller.

Lisa Holder, under appointment by the Court of Appeal, for Defendant and Appellant Kierre T. Strong.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II, Deputy Attorney General, for Plaintiff and Respondent.

_____

Following a joint trial with separate juries, defendants Charles M. Miller and Kierre T. Strong were found guilty of home invasion robbery and dissuading a witness by force or threat. Both defendants appealed. On appeal, Miller contends the trial court erred in denying his *Batson/Wheeler*[1] motion asserting the prosecutor improperly exercised peremptory challenges against three white male jurors. Strong's appointed counsel has filed an opening brief raising no issues pursuant to *People v. Wende* (1979) 25 Cal.3d 436. We affirm the judgment as to both defendants.

## FACTS

On a February evening in 2012, Delise Frias was home alone. Someone knocked on her door and rang her doorbell. She opened the door and saw a man she eventually identified as Strong. Frias asked if she could help him, to which Strong responded, "Do you recognize me?" Strong then brandished a gun and pushed past Frias into her house. Miller and a woman followed Strong into the house.[2] Strong told Frias to go into the kitchen. He stayed next to her, holding the gun, while Miller and the woman went into the other rooms of the house and took things. Frias saw Miller with her purse. Her driver's license was inside. Miller told Frias he had her purse, he knew who she was, and he knew where she lived. Frias saw the woman take a television. Strong had Frias move to the bedroom. Frias saw the woman take a box containing jewelry from a safe in the bedroom. Miller again told Frias he had her identification and her purse, and he knew where she lived. Eventually the three left. Items were missing from Frias's house, such as a flat screen television, a Wii game system, a laptop computer, and jewelry.

A neighbor's boyfriend saw Frias's door open and thought something might be amiss. He then saw three people leave Frias's house and get into a car. Two of the people were carrying bags.

---

[1]     *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258, overruled in part by *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*).

[2]     Frias initially told police the second man was African-American. However, she identified Miller as the second male intruder at the preliminary hearing and at trial. Miller is white.

In April 2012, police found Frias's driver's license in Miller's home while executing a search warrant on another matter.[3] In recorded interviews with police, both Miller and Strong admitted participating in the robbery.

Trial proceeded with separate juries. The juries found Miller and Strong guilty of first degree robbery (Pen. Code, § 211),[4] and found true accompanying allegations that the defendants acted in concert with two or more people, committing the robbery within an inhabited dwelling house (§ 213, subd. (a)(1)(A)), and that a principal was armed with a firearm (§ 12022, subd. (a)(1)). The juries further found Miller and Strong guilty of dissuading a witness by force or threat (§ 136.1, subd. (c)(1)), and found true the accompanying allegation that a principal in the offense was armed with a firearm (§ 12022, subd. (a)(1)). Strong's jury found true allegations that he personally used a firearm in the commission of both crimes (§ 12022.53, subd. (b)). Miller admitted a prior strike. The trial court sentenced him to a total prison term of 30 years. The trial court sentenced Strong to a total prison term of 26 years.[5]

## DISCUSSION

I.    **Miller's Appeal:  The Trial Court Did Not Err in Denying Miller's**
      ***Batson/Wheeler* Motion**

Miller's sole contention on appeal is the trial court erred in denying his *Batson/Wheeler* motion. We find no error.

---

**3**    The information in the instant case also charged Miller with first degree residential burglary, grand theft firearm, and possession of a firearm by a felon. These charges were not factually related to the Frias robbery. Miller's jury acquitted him of these charges.

**4**    All further statutory references are to the Penal Code.

**5**    The trial court sentenced Strong to a nine-year upper term for the robbery count, with a 10-year consecutive sentence for the firearm enhancement. The court further imposed a three-year midterm consecutive sentence on the dissuading a witness count, with an additional midterm four-year sentence for the firearm enhancement, for a total of 26 years. The court also assessed various fines and fees and ordered restitution, jointly and severally with Miller.

### A. Background

During voir dire, the trial court, defense counsel, and the prosecutor asked questions of the prospective jurors. The trial court asked the prospective jurors where they lived; their occupations; whether they were married, had children, or lived with other adults; the occupations of their spouses, adult children, or other adults living with them; and questions about any prior jury service. Defense counsel and the prosecutor asked jurors additional questions.

With his first four peremptory strikes, the prosecutor excused Juror Nos. 1, 6, 8, and 17.[6] After the prosecutor's fourth peremptory challenge, defense counsel made a "*Wheeler* motion." Defense counsel explained: "It appears that [the prosecutor] is excusing all the younger white males. It appears he has a selective group of exclusions. And I think it's inappropriate."

The trial court responded: "I do not see a pattern of discrimination. And by my count, he has exercised four peremptories. The first two are the white males, the third was a Hispanic male and the fourth has been to a white male. [¶] I also note for the record, that the defense's three challenges; they have exercised two against males, one white, one Hispanic. But in all of the prosecution's excusals, I could certainly see various neutral reasons for the excusal of those jurors. [¶] All of them appeared to me— they were all single with no children. I believe one had—the Hispanic had two children. But at any rate, they all appeared to be people with extremely limited life experience.

---

**6** Juror No. 1 was unmarried, had two minor children, and worked at a Subway restaurant on an air force base. He lived with his retired "grandpa," and had never before served on a jury. Juror No. 6 was unmarried, had no children, and worked at a tire shop. He lived with his parents, one of whom was still employed. He had never before served on a jury. Juror No. 8 was unmarried, had no children, and worked as a machinist. He lived with his mother, who was unemployed. He had never served on a jury. Juror No. 17 was unmarried, had no children, and was unemployed, but had worked before as a lab tech. He lived with his parents, one of whom had been laid off; the other parent was still working. He had never before served on a jury. As described in greater detail below, the record indicates Juror Nos. 8 and 17 disclosed negative experiences with law enforcement or the criminal justice system.

[¶] In addition, we had one with a girlfriend. I don't want to do this at this time. But because I don't find a prima facie case, I can go through the court's notes on them— and also the People could make a record if they want. [¶] I am just going to note after the fourth challenge, the *Wheeler* motion was made. And you can make your record once the jury is selected, because I don't see a pattern of discrimination against white males." The prosecutor excused five additional jurors before the full panel and alternates were finalized.

### B. Discussion

On appeal, Miller contends the trial court erred in using an improper standard to evaluate the *Batson/Wheeler* motion, and in speculating about what the prosecutor's reasons may have been for dismissing the three white male jurors. It is not clear that the trial court used an improper standard. That the trial court mentioned only *Wheeler* by name does not show the court failed to apply more recent law in ruling on the defense motion. A court may refer to a "*Wheeler* motion," even while applying current law in evaluating such motions. Further, the trial court's reference to a lack of a "pattern" of discrimination does not establish it was applying an improper standard. (See *People v. Clark* (2011) 52 Cal.4th 856, 906 ["Although the prosecutor ultimately excused four of the five African-Americans called to the jury box, there was no discernable pattern from which to infer discrimination."]; *People v. Bonilla* (2007) 41 Cal.4th 313, 342 (*Bonilla*) [while the issue is not whether there is a pattern of systematic exclusion, "'in drawing an inference of discrimination from the fact one party has excused "most or all" members of a cognizable group'— . . . 'a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.]"].)

But even if the trial court used the wrong standard, we do not necessarily reverse the judgment or remand for further proceedings. (*People v. Bell* (2007) 40 Cal.4th 582, 597.) Where it is not clear if the trial court used the correct standard, we independently resolve the legal question of whether the record supports an inference that the prosecutor exercised peremptory challenges on a prohibited discriminatory basis. (*People v. Harris*

5

(2013) 57 Cal.4th 804, 833 (*Harris*); *Bonilla, supra*, 41 Cal.4th at p. 342.) Applying that standard here, we find no error.[7]

Our high court recently explained the law governing *Batson/Wheeler* motions, as set forth in *Johnson, supra*, 545 U.S. 162: "'In ruling on a motion challenging the exercise of peremptory strikes, the trial court follows a three-step procedure. "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citation.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" ([*Johnson, supra*, 545 U.S. at p. 168], fn. omitted.)' [Citation.] . . . [A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' (*Johnson, supra*, 545 U.S. at p. 170.)" (*Harris, supra*, 57 Cal.4th at p. 833.)

"Although a prima facie showing may be made from any evidence in the record, we have noted 'certain types of evidence that will be relevant for this purpose. Thus the party may show that [opposing counsel] has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of . . . peremptories against the group. [The moving party] may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of

---

**7**      The trial court did not ask the prosecutor for his reasons for excusing the three challenged jurors, and explicitly found no prima facie case of discrimination. Thus, this is a "first stage" case, rather than a "third stage," or "first stage/third stage" hybrid. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1320; *People v. Mills* (2010) 48 Cal.4th 158, 174.)

6

[opposing counsel] to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, . . . the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if [the defendant] is, and especially if in addition [the] alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention.' (*Wheeler, supra*, 22 Cal.3d at pp. 280-281, fn. omitted.)" (*Harris, supra*, 57 Cal.4th at pp. 834-835.)

Here, Miller's motion relied solely on the prosecution's exercise of three of his first four peremptories on "younger white males." There is no information in the record regarding the overall demographics of the venire, no information about the number of white men in the group, and no information about how many white men, if any, remained on the jury panel after the prosecution's peremptory challenges at issue. Without such information, it is difficult, if not impossible, to draw any inferences from the prosecution's use of three of four peremptory challenges against white men. (*People v. Edwards* (2013) 57 Cal.4th 658, 698 [defense counsel's assertion at trial that challenged prospective juror was Black, and there was only one other Black prospective juror, was insufficient to establish a prima facie case].)

In any event, nothing in the record suggests the prosecutor struck most or all of the white men in the group. (*People v. Taylor* (2010) 48 Cal.4th 574, 615 (*Taylor*); *People v. Adanandus* (2007) 157 Cal.App.4th 496, 503-504 [in the absence of other information, no inference of discrimination solely from prosecutor's exercise of peremptories against three African-American jurors].) Indeed, defense counsel's qualification that the prosecution was excusing "younger" white males suggests the concern was not the exclusion of white men, but of a smaller subset of "younger" white men. However, "young persons are not a cognizable group" under *Batson* or *Wheeler*. (*People v. Lewis* (2008) 43 Cal.4th 415, 482 disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920; *People v. Perez* (1994) 29 Cal.App.4th 1313, 1328-1329.)

Further, the defense did not demonstrate that the only commonality among the excused jurors was their status as white males. Indeed, defense counsel's explanation

indicated that all three were "younger," and the court's comments suggest the fourth excused juror, a Hispanic man, was also relatively young, or lacked life experience.[8] The four excused jurors, including the Hispanic juror, shared other characteristics. All four lived with their parents or a grandparent. None was married.[9] The record does not show that, in all other respects besides race and sex, the three challenged white male prospective jurors were as heterogeneous as the community as a whole.

In addition, the record reflects the prosecutor engaged at least two of the three excused jurors in discussions beyond the trial court's initial questions. The record includes the following colloquy:

"[Prosecutor]: Juror Number 8, yesterday you talked about unfair treatment with your family members, I think it was. Same question to you. [¶] The system is a big system here. . . . [¶] So looking at that unfair treatment that you perceived that occurred to your family, does that make you walk away from that situation and come into this jury situation and say, 'I saw that unfair treatment and it's gonna be really hard for me to listen to a police officer and give them the credibility that they deserve?['] [¶] You understand the question?

"[Juror 8]: Yes. It's not an issue because I have a family member who's in law enforcement.

"[Prosecutor]: Who else had an issue? Juror Number 17, same question to you. I don't want to go into all the details again.

"[Juror 17]: It is was just a one time occurrence. I got over it."

---

[8]  Defendant asserts the trial court improperly hypothesized about the prosecutor's reasons for excusing the three jurors. In *Johnson*, the high court reasoned that when there are inferences that discrimination may have happened, the next step is for the court to ask the prosecutor to justify the challenges, rather than to engage in judicial speculation about the possible reasons for the challenges. (*Johnson, supra*, 545 U.S. at pp. 172-173.) However, a court may still consider the totality of the circumstances in determining whether an inference of discrimination can be drawn, including commonalities among the excused jurors beyond their race or other group characteristic, and obvious race-neutral reasons for excusing a juror. (See, e.g., *Harris, supra*, 57 Cal.4th at p. 835; *People v. Thomas* (2012) 53 Cal.4th 771, 795; *Taylor, supra*, 48 Cal.4th at p. 616.)

[9]  It appears the prosecutor later exercised a peremptory challenge against Juror No. 21, who also was unmarried and lived with his or her parents. We have no demographic information about Juror No. 21.

As to these two jurors, voir dire was more than desultory.  Further, the record suggests both Juror No. 8 and Juror No. 17 admitted having negative experiences with the criminal justice system.  This is a race-neutral reason for a prosecutor to excuse a juror. (*People v. Lenix* (2008) 44 Cal.4th 602, 628.)  Finally, while the three excused jurors were white men, like Miller, there is no information in the record regarding the race of the victim, or the racial makeup of the remaining members of the jury panel.  (*People v. Pearson* (2013) 56 Cal.4th 393, 422 [prosecutor's excusal of all members of particular group may give rise to inference of discrimination, especially if defendant belongs to same group, but the inference is not dispositive].)  Defense counsel did not mention these factors when making the *Batson/Wheeler* motion.

A defendant should make as complete a record as possible when attempting to establish a prima facie case under *Batson.*  (*People v. Farnam* (2002) 28 Cal.4th 107, 135; *People v. Morris* (2003) 107 Cal.App.4th 402, 409.)  Defendant failed to make such a record in this case, and the record before us fails to give rise to an inference of discrimination.  We find no error in the trial court's denial of Miller's *Batson/Wheeler* motion.

## II.    Strong's Appeal

Strong filed a timely notice of appeal.  We appointed appellate defense counsel. On July 16, 2013, Strong's appointed counsel filed an opening brief raising no issues pursuant to *People v. Wende, supra*, 25 Cal.3d 436.  On the same day, we notified Strong by letter that he could submit within 30 days any ground of appeal, contention, or argument he wished us to consider.  Strong has not filed a response.  We have independently reviewed the record submitted on appeal, and are satisfied that Strong's appointed counsel has fulfilled her duty, and that no arguable issues exist.  (See *People v. Wende, supra*, 25 Cal.3d 436; *People v. Kelly* (2006) 40 Cal.4th 106.)

**DISPOSITION**

The judgment is affirmed.

BIGELOW, P. J.

We concur:

RUBIN, J.

FLIER, J.

10